## John Peters *et al. versus* Joseph Ballistier *et al.*

Where it was agreed before the sailing of a vessel, that the bill of lading of the cargo should be assigned as security for a debt, but the assignment was not made until after she had sailed, though by being antedated it purported to have been made while she was at home, and no possession of the property was taken, it was *held*, nevertheless, that the assignment was valid as between the parties, and as against strangers who should not acquire a legal title to the property without notice of the assignment.

The owner of a ship and cargo sent them to the West Indies, directing the master to sell the cargo, and bring or send home a return cargo, the principal object of the voyage being the freighting business among the islands, and also directing him to manage the voyage in such manner as in his opinion should be most advantageous. The master accordingly sold the outward cargo, and purchased a return cargo, but found no opportunity to send it home. It was *held*, that even if he might be justified in selling it again for the purpose of going into the freighting business, or with an ultimate view to a return cargo, yet that he was not authorized to sell it to a creditor of his owner for the purpose of paying the debt, notwithstanding such creditor threatened, in case of his refusal, to detain the vessel and cargo by .egal process.

*Held*, also, that such a sale not being in the ordinary course of business, the owner was not left to his remedy against the master only, but that he might disaffirm the sale.

The value of the property thus sold being greater than the amount of the debt, the creditor paid the master the balance in money; and this balance was applied by an agent of the owner to the disbursements of other vessels which had belonged to him, but which had been transferred to the assignee of the bill of lading before mentioned. The assignee wrote to the creditor, claiming repayment of the amount of the debt, which was refused, and he then brought an action of *assumpsit* to recover the same amount. That action he discontinued, and afterwards brought *trover* for the whole of the property sold to the creditor. *Held*, that the assignee had not affirmed the sale, but that it would have been otherwise, if he had not discontinued the action of *assumpsit*. *Held*, also, that *trover* lay for the whole property sold, but that the creditor might maintain an action against the assignee for the balance that had been paid to the master on a contract which failed, and had been expended for the benefit of the assignee.

Trover for several hogsheads of molasses. Plea, the general issue.

To prove tneir property, the plaintiffs produced a bill of lading, made on the 11th of May, 1822, of certain articles shipped on board of the brig Enterprise, Paul E. Merrill master, then at Portland, and bound for the West Indies, in the name and for the account of William Gordon the owner. On the bill of lading was an indorsement by Gordon, stating that " the property named in the bill of lading, or the pro-

524

ceeds thereof, was to be subject to the orders of the plaintiffs, and pledged to them for the security of 7400 dollars," which they had advanced to Gordon, to enable him to procure the cargo. This assignment, though bearing date of the 11th of May, was not made and signed until after the 1st of June ; but it had been agreed between the plaintiffs and Gordon, before the cargo was shipped, that the bill of lading should be so assigned to them as security. The vessel sailed on the 16th ot May ; no actual possession of the cargo having been taken by the plaintiffs, and Merrill having no knowledge that the bill of lading was to be thus indorsed, or that the plaintiffs had any interest in the cargo. In the instructions given to Merrill be fore he sailed, dated May 13th, 1822, he is directed to go to Point Petre, in Guadaloupe, where, says Gordon, " you are to do the best you can for my interest ; and in the prosecution of the voyage, your own judgment will be relied upon in its management as in your opinion will be most advantageous." Merrill proceeded to Point Petre, where he sold part of his cargo, and with the proceeds purchased the molasses which is the subject of this suit. Thence he sailed with the molasses to the island of St. Thomas, where he received two letters from Gordon, informing him of Gordon's failure and directing him " to ship the cargo of the Enterprise to Peters, Pond, & Co. of Boston," and giving the form of a bill of lading for that purpose. The defendants had drawn a bill on Gordon for upwards of 2000 dollars which he owed them, and this bill had been refused acceptance, though intelligence of the refusal had not reached the defendants. Upon learning the failure of Gordon, they demanded payment of their debt of Merrill, and proposed to purchase the molasses and to pay him therefor, deducting their debt from the price. Merrill not assenting to this, they represented to him, that they should take measures, by detaining the vessel or otherwise, to compel payment. He thereupon sold the molasses to them, at an agreed price, and received the balance (2000 dollars), after deducting the debt (2,139 dollars, 49 cents), and took a discharge of the debt for Gordon. This balance was paid over by Merrill to an agent of Gordon, and was appropriated for disbursements of other vessels belonging to him, but which also had been assigned to

Peters
v.
Ballistier.

497

Peters
*v.*
Ballistier.

the plaintiffs for security for advances ; so that the plaintiffs had the benefit of those disbursements. Merrill gave bills of lading of the molasses to the defendants, and agreed to carry it for them to New York at a stipulated freight. He sailed accordingly, and was driven by stress of weather into St. Domingo ; and there the vessel was lost, and the cargo sold for the benefit of the underwriters. Merrill deposed that he was the brother-in-law of Gordon, and that he had sailed with such general instructions five voyages before. It appeared also, that on those voyages he traded according to his discretion for the account of his owner, until he obtained a cargo with which he was willing to return home, and that Gordon was satisfied with his conduct. Merrill further stated, that there was an understanding between Gordon and himself, that he might dispose of so much of the cargo as would sell at Point Petre, and ship the proceeds to Portland, and then go to St. Domingo, there to sell the rest of the outward cargo, and ship the proceeds to the United States ; and that he should then go into the freighting business among the islands ; that the principal object was freight ; that in former voyages he had carried on freighting business between St. Domingo and St. Thomas ; and that when he sailed on this voyage, it was supposed that similar business would be alike advantageous. He said, that as he had no opportunity to ship the proceeds of his outward cargo to the United States, he felt authorized to sell them to any person, with a view to the freighting business. The defendants did not see the original instructions or letters to Merrill, nor make inquiry concerning the extent ɪ his authority ; neither did he inform them concerning the same ; but they must have known that the molasses was taken on board as return cargo. The plaintiffs, on the 4th of December, 1822, wrote to the defendants, complaining of Merrill's having paid them 2,139 dollars, part of the proceeds of the cargo of the Enterprise, saying that the cargo belonged to themselves, and that the money was paid wrongfully, and claiming to have it repaid. The plaintiffs also brought an action of *assumpsit* against the defendants to recover that same sum, but it was discontinued before the commencement of the present suit.

By direction of the Chief Justice, who tried the cause, a verdict was returned for the plaintiffs, subject to the opinion of the whole Court on the foregoing facts.

*Prescott* and *F. Dexter*, for the defendants, contended that the indorsement and delivery of the bill of lading, did not, under the circumstances, transfer the property to the plaintiffs, nor give them any lien upon it. There was no pledge, because no possession was taken. *Portland Bank* v. *Stubbs*, 6 Mass. R. 422. Merrill was the consignee, and he alone could transfer the property by an indorsement and delivery of the bill of lading. But such an indorsement and delivery constitute a transfer, only where the property is at sea. *Buffington* v *Curtis*, 15 Mass. R. 528; *Caldwell* v. *Ball*, 1 T. R. 216; *Lempriere* v. *Pasley*, 2 T. R. 490; *Gardner* v. *Howland*, 2 Pick. 604; *Lanfear* v. *Sumner*, 17 Mass. R. 110. The parties have dated the indorsement the 11th of May, when the property was here. The agreement was then made, and the ceremony of putting it in writing afterwards can have no effect in dispensing with the necessity of possession. The plaintiffs permit the property to go to sea without notice to the master of the transfer, thus enabling him to sell to persons who are alike ignorant of that fact. The assignment was intended as a secret lien, and it was fraudulent as against creditors or pur chasers. The defendants stand in both those relations.

But admitting the transfer to be valid, the master, being ignorant of it, had a right to make the sale, and it is binding on Gordon and on the plaintiffs. He was the general agent of Gordon, and was acting in the matter of his agency. Paley on Princip. and Ag. 139, 145; *Fenn* v. *Harrison*, 3 T. R. 760. He was bound only to exercise good faith, and he acted both with good faith and with good judgment, in not subjecting the property to the restraint of legal process; and his conduct, under the extraordinary circumstances, should receive a liberal construction. *Lyle* v. *Clason*, 1 Caines's R. 342; *Drummond* v. *Wood*, 2 Caines's R. 310; *The Gratitudine*, 3 Rob. Adm. R. 211. The letters received by him did not amount to a revocation of his authority, and if they did, the defendants, being ignorant of their contents, would not be affected by the revocation. It is true, that they had heard of Gordon's failure;

**499**

but that was not a revocation, we having no bankrupt law. They knew that his authority was general, and they were not obliged to look any further. A general agent binds his principal, even if he exceeds his authority.

It appears from the evidence in the case, that after Merrill returned home, Gordon acquiesced in the sale ; and this, without an express approval, is a sufficient ratification by him *Prince* v. *Clark,* 1 Barn. & Cressw. 186.

But what is of more importance, the plaintiffs themselves have so far ratified the doings of the master, that they cannot maintain this action. They have had the benefit of part of the proceeds of the sale, and with a knowledge of all the facts, they have claimed in their letter only the balance. Bringing the action of *assumpsit* was also a ratification, and a waiver of the tort. . The assent for a moment was sufficient, and the discontinuing of the action could not affect the previous ratification. *Hunter* v. *Prinsep,* 10 East, 390. The adoption of an agency in part, is an adoption of it in the whole. Paley, 145, 146.

It will be said, that although Merrill might perhaps sell the property, in order to go into the freighting business, he could not do so for the purpose of paying a debt. The answer is, that the sale would not be void, but the principal would have his remedy against the agent. *Scott* v. *Surman,* Willes, 400

*Gorham* and *Bliss,* for the plaintiffs, cited authorities to the following points:— that where an agent makes an unauthorized sale, the owner may have trover, *Wilkinson* v. *King,* 2 Campb. 335 ; *Baring* v. *Corrie,* 2 Barn. & Ald. 137 ; *M'Combie* v. *Davies,* 6 East, 538 ; *S. C.* 7 East, 7 ; — that the purchaser must examine into the power of the agent, *De Bouchout* v. *Goldsmid,* 5 Ves. 213 ; *Newsom* v. *Thornton,* 6 East, 17, 43 ; *Baring* v. *Corrie,* 2 Barn. & Ald. 149 ; *Martini* v. *Coles,* 1 Maule & Selw. 140 ; — that the transfer was valid, and that it was a mortgage rather than a pledge, *Lickbarrow* v. *Mason,* 6 East, 20, note ; *Portland Bank* v. *Stacey,* 4 Mass. R. 661 ; *Gardner* v. *Howland,* 2 Pick. 599 · *Bartlett* v. *Williams,* 1 Pick. 295 ; *Robinson* v. *M'Donnell,* 2 Barn. & Ald. 134 ; *Kelly* v. *Munson,* 7 Mass. R. 319 ; *Robinson* v. *United Ins. Co.* 1 Johns. R. 593 ; *Edwards* v.

*Harben,* 2 T. R. 587 ; *Hibbert* v. *Carter,* 1 T. R. 745 ;
*Estwick* v. *Caillaud,* 5 T. R. 420 ; *Barrow* v. *Paxton,* 5
Johns. R. 258 ; — and that commencing the action of *assump-
sit* was not a ratification, *Hambly* v. *Trott,* Cowp. 371 ; *Smith*
v. *Hodson,* 4 T. R. 211 ; *Lepping* v. *Kedgewin,* 1 Mod. 207 ,
*Field* v. *Jellicus,* 3 Lev. 124 ; *Cummings* v. *Noyes,* 10 Mass.
R. 436 ; Paley, 262, 263.

PUTNAM J. delivered the opinion of the Court. This is
a contest between the creditors of an insolvent debtor ; the
plaintiffs claiming in virtue of an assignment by the debtor
himself, and the defendants claiming under a sale of an agent
of the debtor.

It is objected for the defendants, that the plaintiffs have
proved no title to the outward cargo ; — that the indorsement
on the bill of lading was made when the vessel and cargo
were at home, and possession might then have been taken,
but that no possession was ever taken.

If, however, the transfer was not perfected by a delivery
before the vessel sailed, it might be made when the vessel was
at sea, and the delivery of the bill of lading with the assign-
ment upon it would be valid as between the parties, and
against strangers who did not acquire a legal title without notice
of the assignment.[1]

It has been suggested, that the assignment to the plaintiffs
was fraudulent as against creditors. But we do not perceive
any facts in the case which warrant the suggestion. There
is no reason to doubt that the plaintiffs did make the advances,
and that the assignment was intended to operate in the nature
of a mortgage for their security.[1] They were accountable to
Gordon or his assigns for the surplus.

So that we are brought to the consideration of the title of
the defendants. It is admitted that they could not have been
informed of the dishonor of their bill, when they threatened
to detain the vessel on account of their claim against Gordon.
But nevertheless, Gordon was justly indebted to them for

Peters
*v.*
Ballistier.

*Jan.* 13*th,*
1827.

501

---

[1] See *Parsons* v. *Dickinson,* 11 Pick. 352 ; *Ingraham* v. *Wheeler,* 6 Connect.
R. 284 , 15 Mass. R. (Rand's ed.) 533, n. (*b*).

[1] See *Parks* v. *Hall,* 2 Pick. (2nd ed.) 206, and notes to that case ; *Gor-
don* v. *Mass. F. & M. Ins. Co.* 2 Pick. 249.

advances they had made for him, and we consider them as honest creditors. They knew that Gordon had failed, and they had a right to use any lawful process for the recovery of their debt.

But these considerations do not touch the authority of the master to dispose of this return cargo. What was the extent of his authority ? He was, by the written orders, to prosecute the voyage according as he should think best for his owner. What voyage was intended ? Unquestionably to the West Indies, to sell his outward cargo and to bring home the proceeds in a return cargo. These instructions, although somewhat general, must be confined to those objects, and would not authorize the master to go into a course of speculation, not with a view to a return cargo, which he might think would ultimately be advantageous to his owner. So Gordon says he understood them ; he thought that the proceeds of the outward cargo were not to be disposed of in the West Indies, but that they would be brought home. He says also, indeed, that if the master had, in the exercise of his best discretion, sold them there, he should have assented to it. He might have done so from various motives ; — from motives of interest, or of compassion, or of friendship. But the question now under consideration is, if the master had authority to bind his owner or his assigns, whether willing or unwilling to ratify the sale.

It appears that on some former voyages Merrill had traded for the account of his owner ; that he had sold wine which he had received in part for his outward cargo, for something to be brought home as return cargo ; and it has been contended that he was the general agent, and acting according to his best judgment ; that the defendants were ignorant of the instructions which had been given him ; and we are referred to *Fenn* v. *Harrison*, 3 T. R. 760, where the authority of factors is much discussed. Harrison had sent F H. to sell a bill of exchange, informing him that he would not indorse it, nor in any way become liable upon it ; but F. H. told the person who bought the bill, that as the number of Harrison's house was upon the bill, he would be just as much liable as if he had indorsed it. And Lord *Kenyon* was of

op'nion that Harrison was liable in consequence of the unauthorized representation of his agent; but the other judges, Ashhurst, Buller, and Grose, were clearly of a contrary opinion, on the ground that F. H. was not a general agent, but commissioned for a particular purpose.

Peters
v.
Ballistier.

The general agency may be inferred from the great number of instances in which the agent has acted in the manner as in the case under consideration; and the particular agency is limited to the single transaction.

The original commission in the case at bar was for a particular purpose, namely, to make what is called a West India voyage, according to the master's best discretion. So long as his means were intended and directed accordingly, the owner would be bound, his instructions being general and the means resorted to being within the scope of his authority; but if he should depart from the object of the commission, and instead of making the voyage, should undertake other objects not originally contemplated, it should seem clear, that his owner would not be obliged to confirm his act.[1]

But we think the letter from Gordon, directing the cargo to be sent to the plaintiffs, should be considered as if the purport of it had been originally stated in the orders, because that letter was in Merrill's hands before he sold the molasses to the defendants. So far, therefore, as this case concerned the owner and the master, there was a direct violation of orders.

It is said for the defendants, that they knew nothing of the private instructions which Gordon had given to the master, and should therefore not be prejudiced by them. But the defendants did not make any inquiries as to the extent of his authority. They preferred trusting to the general power usually given to masters of vessels, rather than to such power as upon inquiry it might appear that this master had in fact been invested with. They had a right to know the extent of his commission. If they had inquired, and Merrill had shown them the original orders, and the subsequent instructions to

503

[1] See *Thompson* v. *Stewart*, 3 Connect. R. 171; *Parsons* v. *Armor*, 3 Peters, 428; *Rossiter* v. *Rossiter*, 8 Wendell, 494; *Brydon* v. *Taylor*, 2 Harr. & Johns. 396

send the property to the plaintiffs, it is hardly to be supposed that they would have considered a sale to them as within those instructions.[1]

But the master swears that the freighting business among the islands was the principal object, and that he of course must have had authority to sell the return cargo, if he could not ship it, and that he could not find any opportunity to ship it. If this verbal understanding should be considered as valid between the owner and master, it is evident that the letter which directed the master to send the property to the plaintiffs, must have been a revocation of the project of freighting. But if there had not been any such revocation, the facts do not warrant the sale upon that basis. It was not made with the intent to employ the vessel in freighting among the islands, but because of the importunity of the defendants, and the difficulty, delay, and expense, which the master feared would take place, if he did not comply with their request to pay their claim against Gordon. Surely Gordon had a right to be consulted upon that matter before his property should be so appropriated. It can hardly be supposed, that the orders to a master to perform a voyage in the best way he can, will constitute him the judge for the owner in regard to claims against him, and the mode of satisfying them.

It is argued, however, that if the master had no authority to pay this debt, the owner must seek his remedy against him, but that the sale is good. However that might have been, if the sale had been made in the usual course of business, it is to be remarked, that this was an extraordinary transaction, and calling for a full and particular authority, and not a com mon transaction, like, for example, the sale of the outward cargo, which would be within the general scope of the commission given to the master.

If Gordon had not transferred this property to the plaintiffs, he might have ratified this conduct of his master ; but the plaintiffs may insist upon their legal rights, as his assignees, and if he would not have been bound, the assignees are not to be bound.

---

[1] See *Schimmelpennick* v. *Bayard,* 1 Peters, 290.

Some reliance is placed by the counsel for the defendants, on the fact, that in former voyages Merrill traded according to his discretion for the account of his owner, selling some merchandise he had bought with his outward cargoes for other goods, and that his instructions on this voyage were similar to those given on former voyages, and that his conduct was approved ; — so that there was a practical construction of his authority as extending to the sale of such part of his return cargoes as he should think for his owner's interest.    But this trading in the other voyages was *with a view ultimately to a return cargo.*  He had never in any former voyage disposed of his return cargo abroad, but had brought or sent it home.

This case has none of the hard features of the case of *M'Combie* v. *Davies*, 6 East, 540, where the plaintiff recovered for the tobacco which a broker bought in his own name for the plaintiff, but pledged it to the defendant, who supposed it to be the property of the broker.  In the case at bar, the defendants trusted to the personal responsibility of Gordon, not to this property.  But the plaintiffs relied originally upon this cargo for their security, and procured insurance to be made upon it immediately after the vessel sailed.

It has been argued, that the sale to the defendants has been ratified by Gordon, and by the plaintiffs also.  But we do not perceive any thing in the language or conduct of either, which could amount to a ratification.  Gordon swears that, on the contrary, he expressed his dissatisfaction to Merrill in pretty strong terms.[1]

In regard to the supposed ratification of the plaintiffs, it is contended that they have received the benefit of the 2000 dollars paid by the defendants in cash, and that in their letter to the defendants they claim only *a balance,* to wit, the money paid for the debt of Gordon ; and that they sued the defendants in *assumpsit for the balance,* and so have confirmed the sale, and chosen to look to the defendants merely for part of the proceeds.

505

---

[1] A principal, who neglects promptly to disavow an act of his agent who has transcended his authority, makes the act his own.  *Bredin* v. *Dubarry*, 4 Serg. & Rawle, 27.  See *Richmond Man. Co.* v. *Starks*, 4 Mason, 296.

Implied ratifications, however, extend only to such acts of the agent as are known to the principal at the time.  *Thorndike* v. *Godfrey*, 3 Greenl. 429.

It is true, that the adopting of the acts of an agent in part, is to be considered as the ratification of them in the whole. As in *Wilson* v. *Poulter*, Str. 859, where the assignees of a bankrupt seized a number of South-sea and India bonds, which his agent had bought after his bankruptcy, and brought an action against the agent for the money with which others were purchased ; and it was held, that the accepting of some of the bonds was an affirmance of the act of the agent in laying out the money for them. See the cases upon this point cited in Paley, *pt.* 1, § 2. But in the case at bar, the money appropriated towards the disbursements of the vessels of the plaintiffs, was applied to their use without their knowledge. If they had received the money of Merrill and had so applied it, the case would have been quite different from the present  But they had no election in the matter. The money was paid without their consent, and all that could be required of them would be to account for what had been so expended, upon recovering the value of their property wrongfully delivered to the defendants.

And in regard to their letter, it seems to us to be consisten with these views. It is dated December 4th, 1822. It complains of Merrill's having paid to the defendants 2139 dollars 49 cents, part of the proceeds of the cargo of the Enterprise, which cargo belonged to the plaintiffs ; and they say that sum was paid wrongfully, and claim to have it repaid. Now it seems to us, that it would be a harsh construction of this letter, to consider it as a ratification of the sale of the property by Merrill. It appears rather to mean, that they were willing to make no further claim for damages than for that balance, as they had received the benefit of the disbursements. But this proposal was rejected, and the parties resorted to their legal rights.

And in regard to the action which the plaintiffs sued against the defendants in *assumpsit* for the proceeds — if it had been relied upon, it would have been a ratification of the sale. The case cited of *Smith* v. *Hodson*, 4 T. R. 216, is strongly to that point. But the plaintiffs discovered before trial, that they had misconceived their remedy, and they discontinued their suit. We cannot think that these facts, separately or collectively, amount to a ratification of the sale.

The opinion of all the Court is, that the plaintiffs shall recover. But the action is to stand continued for judgment, to enable the defendants to obtain their judgment against the plaintiffs for the money which has been paid for their benefit upon a contract which has failed, unless the plaintiffs shall allow that sum on account of this verdict.

*Note.* The plaintiffs accordingly agreed to allow it, with interest from the time when it was paid by the defendants.